IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WAWA, INC., a corporation of                    )
the State of New Jersey,                        )
                                                )
        Plaintiff,                              )
                                                )
        v.                                      )        C.A. No. 04-322-KAJ
                                                )
THE GOVERNMENT OF                               )
NEW CASTLE COUNTY,                              )
DELAWARE, a political subdivision               )
of the State of Delaware,                       )
                                                )
                                                )
        Defendant.                              )
                                                )

## DEFENDANT GOVERNMENT OF NEW CASTLE COUNTY'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NEW CASTLE COUNTY LAW
Brian J. Merritt (#3982)
Assistant County Attorney
Mary A. Jacobson (#3508)
First Assistant County Attorney
87 Reads Way
New Castle, DE 19720
(302) 395-5130

Dated: March 16, 2005

# TABLE OF CONTENTS

Cases                                                                                  Page

TABLE OF AUTHORITIES ................................................................................... iii

STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ............................. 1

SUMMARY OF ARGUMENT ................................................................................ 2

STATEMENT OF FACTS ...................................................................................... 4

    1.    Facts Regarding the Parties ..........................................................................

    2.    Site History ....................................................................................................

    3.    History of the UDC Division 40.10.600 ......................................................

ARGUMENT ........................................................................................................ 10

    I.    THE UDC'S ZONING PROVISIONS THAT PROHIBIT THE
        STORAGE OF HAZARDOUS SUBSTANCES AND PETROLEUM
        PRODUCTS IN ENVIRONMENTALLY SENSITIVE AREAS WHILE
        ALLOWING EXISTING OPERATIONS TO CONTINUE AS
        NONCONFORMING USES ARE RATIONALLY RELATED TO THE
        LEGITIMATE GOVERNMENTAL INTEREST OF PROTECTING
        WATER RESOURCES WHILE RECOGNIZING VESTED PROPERTY
        RIGHTS THAT ARE PROTECTED UNDER THE UNITED STATES
        CONSTITUTION AND THE DELAWARE CODE ........................................ 10

        A.    Burden of Proof ................................................................................. 10

            1.    Burden of Proof on a Motion for Summary Judgment ............... 10

            2.    Standard of Review in Equal Protection Cases ................. ........ 10

        B.    The UDC's Prohibition Against the Storage of
            Hazardous Substances and Petroleum Products in
            Environmentally Sensitive Areas is Rationally
            Related to the Legitimate Governmental Interest of
            Protecting Water Resources ................................ .................... 12

      1.   The County has a Legitimate Governmental Interest in Protecting Water Resources...............................................................12

      2.   UDC Division 40.10.600 is Rationally Related to the Legitimate Governmental Interest of Protecting Water Resources………........................................................................ 14

    C.   Prohibiting New Users from Storing Hazardous Substances and Petroleum Products in Environmentally Sensitive Areas  While allowing Existing Users to Continue Operation in Such Areas subject to the UDC's Nonconforming Use Provisions Comports with the Guarantee of Equal Protection under the Fourteenth Amendment to the United States Constitution.......................................18

II.     UDC'S TEMPORARY ALLOWANCE OF NONCONFORMING UNDERGROUND STORAGE TANKS RATIONALLY FURTHERS THE PURPOSE OF PROTECTING WATER RESOURCES WHILE RECOGNIZING VESTED PROPERTY RIGHTS ............................................................................................24

CONCLUSION.............................................................................................................32

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                      <u>Page</u>

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, (1986)............................................................................10

*Bell v. Rocky River Board of Zoning Appeals,*
    702 N.E. 2d 910 (Oh 8th Dist. Ct. App. 1997................................................16

*Boothby v. City of Westbrook,*
23 A.2d 316 (Me 1941).........................................................................20

*C.F. Lytle Co. v. Clark,*
    491 F.2d 834, (10th Cir. 1974) ...........................................................28

*Christy v. Harleston,*
    223 S.E. 2d 861 (1976) .....................................................................30

*City of Juneau v. Badger Co-operative Oil Co.,*
    279 N.W. 666, (Wis. 1938).................................................................19

*Congregation Kol Ami v. Abington Township,*
    309 F.3d 120, (3d Cir. 2002)...........................................................10, 11

*Consumers Gasoline Stations v. City of Pulaski,*
    292 S.W.2d 735, (Tenn. 1956)........................................................20, 21

*Delaware River Basin Commission v. Bucks County Water & Sewer Authority,*
545 F. Supp. 138, (E.D. Pa. 1982) ...............................................16, 24-26

*Delaware River Basin Commission v. Bucks County Water and Sewer Authority,*
641 F.2d 1087, (3d Cir. 1981)...........................................................24-26

*Drake v. Town of Sanford,*
    643 A.2d 367 (Me 1994)..............................................................15, 16

*F.C.C. v. Beach Communications,*
    508 U.S. 307 (U.S. 1993)...................................................................17

*FERC v. Mississippi,*
    456 U.S. 742, 768 n.30 (1982) ............................................................11

*Franmor Realty Corp. v. Le Boeuf,*
    (1951) 104 NYS2d 247, aff'd 109 NYS2d 525,
    rearg and app den 110 NYS2d 910 ................................................................... 28

*Hartley v. City of Colorado Springs,*
    764 P.2d 1216 (1988) ......................................................................................... 29

*Haves v. City of Miami,*
    52 F.3d 918, (11th Circ. 1995) ....................................................................... 17

*Hooper v. Delaware Alcoholic beverages Control Commission,*
    409 A.2d 1046, (Del. 1979) ............................................................................... 23

*In re Martin,*
    504 P. 2d 14 (Nev. 1972) .................................................................................... 19

*Izzo v. Borough of River Edge,*
    843 F. 2d 765, (3d Cir. 1988) ............................................................................ 11

*Mayor and Council of New Castle v. Rollins Outdoor Advertising, Inc.,*
    475 A. 2d 355, (Del. 1984) (en banc) ............................................................... 23

*New Castle County v. Harvey,*
    314 A.2d 616 (Del. Ch. 1974) ....................................................................... 23, 27

*New Orleans v. Dukes,*
    427 U.S. 297, (U.S. 1976) (per curiam) ............................................................ 11

*Nordlinger v. Hahn,*
    505 U.S. 1 (U.S. 1992) ................................................................................... 11, 18

*Rogin v. Bensalem Township,*
    616 F. 2d 680, 688 (3d Cir.1980) ...................................................................... 11

*Sampere v. City of New Orleans,*
    117 So. 827 (1928), *aff'd* 279 U.S. 812 (1929) .............................................. 22

*Schad v. Borough of Mount Ephraim,*
    452 U.S. 61, (1981) ............................................................................................ 11

*Service Oil Co. v. Rhodus,*
    500 P.2d 807 (Colo. 1972) ................................................................................. 29

*Shellburne, Inc. v. Roberts,*
    224 A.2d 250, (Del. 1966) ..................................................................................22

*Standard Oil Co. v. City of Charlottesville,*
    42 F.2d 88, (4th Circ. 1930) .............................................................................21

*Standard Oil Co. v. City of Gadsden,*
    263 F. Supp 502, (N.D. Ala 1967) ....................................................................21

*Vance v. Bradley,*
    440 U.S. 93, (1979) ............................................................................................11

*Village of Belle Terre v. Boraas,*
    416 U.S. 1, (U.S. 1974) .....................................................................................10

*Zahn v. Board of Public Works,*
    234 P. 388 (1925), *aff'd* 274 U.S. 325) ............................................................22

*In re 244.5 Acres of Land v. Delaware Agric. Lands Found.,*
    808 A.2d 753 (Del. 2002) ..................................................................................22

Constitutions

U.S. CONST. amend. XIV ...........................................................................................10

Del. Const. art. II, §25 .................................................................................................12

Statutes

7 Del. C. § 7407 (a) ....................................................................................................15

9 Del. C. §2601 ...........................................................................................................12

9 Del. C. § 2603 ..........................................................................................................12

9 Del. C. § 2610 .....................................................................................12, 18, 23, 24

48 Del. Laws.ch 321 § 14 ...........................................................................................23

Ordinances

UDC  Division 40.08.000 .......................................................................................17, 27

UDC §40.08.020 .........................................................................................................31

UDC §40.08.120 .............................................................................................18, 27, 31

UDC §40.08.130 ..................................................................................... 19, 29-31

UDC Division 40.10.600 ....................................................... 2-9, 12-14, 18, 19, 24, 31

UDC Division 40.33.300 ...........................................................................12, 13, 18

Rules and Regulations

40 CFR 116 .............................................................................................................8

40 CFR 117 .............................................................................................................8

101 C.J.S. Zoning 182, p. 939 ...............................................................................27

Fed. R. Civ. P. 56(c) ............................................................................................10

Other sources

1 Anderson's American Law of Zoning, §6:5 (4th ed.) ..........................................21

1 Anderson's American Law of Zoning, §6:30 (4th ed.) .........................................27

1 Anderson's American Law of Zoning, §6:35 (4th ed.) .........................................29

1 Rathkopf's The Law of Zoning and Planning, § 4:7 ..........................................21

## STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

On May 19, 2004, Wawa, Inc. ("Wawa") filed a Complaint for Declaratory Relief and for an Injunction ("Complaint") against the Government of New Castle County, Delaware ("County") pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201. Wawa challenges the constitutionality of a provision of the New Castle County Code, asserting that the provision violates the Equal Protection Clause of the U.S. Constitution. For the purpose of resolving this litigation, the parties entered a Joint Stipulation of Facts setting forth all material facts relevant to resolving whether the provision violates the Equal Protection Clause. Wawa filed its motion for summary judgment on February 25, 2005. Since a denial of Wawa's motion for summary judgment is, in effect, a case dispositive determination in favor of New Castle County, the County filed its cross-motion for summary judgment on March 16, 2005. This is Defendant County's Answering Brief in Opposition to Wawa's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

I.    Unified Development Code ("UDC") Division 40.10.600 does not violate the Equal Protection Clause.  It is undisputed that the County's purpose in enacting this division was to protect the County's water resources and ensure a safe supply of public water for its citizens, and that this is a legitimate government interest.  Determining that petroleum underground storage tanks ("USTs") presented a threat to Water Resource Protection Areas ("WRPAs") because of the risk of petroleum release, the UDC was amended to ban the use of USTs in these areas.  As a result, existing USTs within WRPAs became nonconforming uses – lawful at the time of the change in the zoning regulation, but restricted so that they may eventually be terminated.  Allowing the temporary continuance of existing USTs under nonconforming use regulations while banning new USTs rationally furthers the County's legitimate government interest.  In addition, UDC Division 40.10.600 (B) allows USTs to be upgraded when the State of Delaware's Department of Natural Resources and Environmental Control ("DNREC") requires such an upgrade.  Since DNREC is authorized to require an upgrade to protect human health and the environment, allowing existing USTs to be upgraded pursuant to a DNREC requirement rationally furthers the County's legitimate government interest as well.

II.    As nonconforming uses, USTs within WRPAs are permitted to continue, subject to restrictions that are intended to have the eventual effect of terminating the nonconforming use.  The Third Circuit has expressed concern that permanent grandfather clauses may not rationally further legitimate government ends; however, the gradual

2

approach exemplified in temporary exemptions satisfies the Equal Protection Clause. The County's nonconforming use regulations represent the acceptable, gradual approach. When DNREC requires an upgrade of a UST in a WRPA, UDC Division 40.10.600 allows the upgrade. Otherwise, USTs within WRPAs, like all other nonconforming uses, are subject to termination when they are destroyed in excess of fifty percent of their assessed value. In addition, a UST within a WRPA may not be extended or expanded, and use of the UST is terminated after a discontinuance of six months.

## STATEMENT OF FACTS

1. **Facts Regarding the Parties**

   The County accepts Wawa's statement of the facts regarding the parties.

2. **Site History**

   Since 1990, Wawa has operated a convenience store located on South DuPont

Parkway, within New Castle County (the "Tybouts Corner Location" or "Site"). (J.A. 7,

¶ 19). The existing Wawa store at the Tybouts Corner Location does not sell gasoline

products. (*Id.*) Prior to 1990, however, the Tybouts Corner Location was occupied by a

gasoline service station. (*Id.*) In 1989, the Site was subject to an investigation by

DNREC. (*Id.*) Leaking underground storage tanks were discovered and corrective action

was ordered. (*Id.*) Seven gasoline USTs and one diesel UST were removed from the

Site. (*Id.*) The Site is located in both a wellhead Water Resource Protection Area

("WRPA") and a recharge WRPA. (J.A. 8, ¶ 20).

   In May of 2002, Wawa filed an application (the "Application") with the County

that would allow the installation of underground petroleum storage tanks and gasoline

dispensing facilities on the Site. (*Id.*) The County's Department of Land Use determined

that the application was unacceptable, in part, because the provisions of UDC Division

40.10.600 prohibited the construction or location of facilities proposed for petroleum

storage at the Tybouts Corner Location. (*Id.*) Wawa then sought a variance from this

provision from the New Castle County Board of Adjustment (the "Board"). (J.A. 8, ¶

20).

   As part of the application for a variance from the Board, Wawa went before the

Resource Protection Area Technical Advisory Committee ("RPATAC") for a

4

recommendation on the variance. (J.A. 8, ¶ 23). RPATAC recommended that the Board deny the variance, acknowledging that Wawa's proposal to adopt tertiary containment and other protective measures for the Site exceeded current regulations by DNREC. (J.A. 9, ¶ 24). The Board eventually denied the requested variance, noting the UDC's intent to prevent further incursions into WPRAs by gas stations. (J.A. 8-9, ¶ 23). Wawa subsequently appealed the Board's decision to the Superior Court, which then affirmed the Board's decision to deny the variance. (J.A. 9-10, ¶ 26). Even though approximately 76 percent of the land in New Castle County south of I-95 and west of Highway One is not hindered by WRPA restrictions, Wawa nevertheless seeks to build gas stations on land subject to WRPA restrictions, such as the Tybout's Corner Location. (J.A. 6-7, ¶ 16, 18). As a result, Wawa filed this action, challenging the constitutionality of UDC Division 40.10.600.

**3.    History of Division 40.10.600**

In 1988, the County published Issues Papers as a component of the County's Comprehensive Plan Update process. (J.A. 2, ¶ 4). In preparing the Issues Papers, a natural resource committee was formed to study and comment on the major issues involving the County's natural resources. (*Id.*) The committee analyzed the critical nature of ground and surface water resources, both to public health, safety, welfare, and aesthetics and to the viability of continued economic development. (*Id.*) The committee found that public water supplies are dependent on both good quality and availability of good surface and groundwater resources. (*Id.*) The committee noted that water resources are vulnerable to pollution from a wide variety of sources including hazardous substances. (*Id.*) The committee specifically noted that gasoline and fuel oil from

leaking underground storage tanks have caused a number of surface and groundwater pollution incidents. (*Id.*) Since 1988, the Comprehensive Plan updates adopted by County Council have clearly and continuously identified the legitimate governmental interest in protecting the County's water resources. (J.A. 2, ¶ 5).

The County Code was amended on September 23, 1991, to create Water Resource Protection Area Districts. (J.A. 3, ¶ 6). For the first time, the 1991 amendment identified four different categories of WRPAs: (1) the Cockeysville Formation Protection Area, (2) the Wellhead Resource Protection Area, (3) the Surface Water Resource Protection Areas, and (4) the Recharge Resource Protection Areas. (*Id.*) The 1991 amendment restricted the uses permitted in WRPAs. (*Id.*) No development of any kind was permitted within 300 feet of a public water supply wellhead (or a minimum of 60 day horizontal time of travel from any public water supply, whichever is less). (*Id.*) Underground storage of petroleum products was prohibited in floodplains and subject to restrictions in all other WRPAs. (*Id.*) The uses permitted in WRPAs were further restricted by a 1994 Code amendment. (J.A. 3, ¶ 7).

The adoption of the Unified Development Code ("UDC") on December 31, 1997 brought even more restrictions upon uses within WRPAs. The prohibition on underground storage of petroleum products was expanded to include recharge areas, floodplains, floodways, riparian buffers, and sinkholes. (J.A. 3, ¶ 8). No development of any kind was permitted within 300 feet of a wellhead. (*Id.*) Additional development restrictions were applicable beyond the 300 foot radius depending on whether the wellhead was a class A, B or C wellhead. (*Id.*) Storage of petroleum products was permitted in other water resource protection areas provided an environmental impact

assessment was prepared that demonstrated proper safeguards could be provided. (J.A. 3-4, ¶ 8).     Wellhead and Cockeysville Formation water resource protection areas were subject to compliance with additional standards including the requirement to provide secondary containment measures. (J.A. 4, ¶ 8).

The UDC was amended on September 22, 1998. (J.A. 4, ¶ 9). Under the 1998 amendment, the prohibition on the storage of petroleum products was further expanded to include the Cockeysville Formation, steep slopes, critical nature areas and wetlands. (*Id.*) A new provision was added that allowed the replacement of existing underground petroleum storage tanks in WRPAs where an upgrade was required by DNREC and all state and federal regulations were met. (*Id.*) This provision was drafted by the County to ensure that all existing tanks would continue to comply with DNREC requirements for the upgrading of existing petroleum and hazardous substance underground tanks. (J.A. 4, ¶ 10). According to DNREC regulations in effect at that time, which have not been amended since, any existing hazardous substance UST system had to meet certain designated upgrade requirements by January 1, 1998. (*Id.*) Any existing petroleum underground storage tank had to meet certain designated upgraded corrosion protection requirements by December 22, 1998. (*Id.*) The County understood that the imposition of further universal upgrade requirements by DNREC at some point in the future was a possibility and it wanted to ensure that tanks within WRPAs would comply with those requirements. (J.A. 4-5, ¶ 10).

The UDC was amended again on December 14, 1999, expanding the prohibition on the storage of petroleum products to include drainageways. The 1999 amendment

revised the clause into the form that exists today.  UDC Division 40.10.600 now

provides:

> The storage, maintenance, use, or sale of substances listed in 40 CFR 116 in an aggregate quantity equal to or greater than a reportable quantity as defined in 40 CFR 117 shall be governed by the following provisions. Petroleum products shall also meet the requirements of this section.
>
> A.  All such activities are prohibited in floodplains, floodways, wellhead class A, B or C, the Cockeysville Formation, drainageways, recharge areas, steep slopes, critical natural areas, wetlands, riparian buffers and sinkholes, unless such substances are used in the process of public water supply and treatment and sewer treatment facilities.
>
> B.  The replacement of existing underground petroleum storage tanks in any area other than a Water Resource Protection Area (WRPA) shall be permitted provided all State and Federal regulations are met. The replacement of existing underground petroleum storage tanks in a Water Resource Protection Area (WRPA) where an upgrade is required by DNREC shall be permitted provided all State and Federal regulations are met and secondary containment is provided.
>
> C.  In all other areas where permitted, above ground storage shall be permitted provided such facilities are designed so that all spills are fully contained in a secondary containment facility that is designed such that there is no spill into soils, surface waters, sewers. The replacement of existing above ground storage facilities in any area shall be permitted provided the State Fire Marshall's Office provides the Department with written approval and all other applicable State and Federal regulations are met and secondary containment is provided. Secondary containment shall not be required for above ground storage used exclusively for private residential purposes when located on the residential lot within the setback lines.
>
> D.  In all other areas where permitted, underground storage shall be permitted only for petroleum products, provided all State and federal regulations are met.

All of the underground storage tanks currently located within WRPAs, and the

related components, such as underground piping, are engineered to resist corrosion and

leaks, and such equipment is typically both designed and warranted to resist corrosion for thirty (30) years. (J.A. 7, ¶ 17).    If an underground storage tanks remains underground for a period longer than it was designed and engineered to remain underground, the warranty expires and the risk of leaks from the tank itself or from associated piping or equipment increases. *Id.*

The County's purpose in enacting UDC Division 40.10.600(A) was to protect the County's water resources and ensure a safe supply of public water for the health and safety of the community.  (J.A. 6, ¶ 13).    The parties to this action agree that this is a legitimate governmental interest. *Id.*  In the area of New Castle County south of Route 40, 100 percent of the drinking water supply is provided by groundwater resources. *Id.* When it passed UDC Division 40.10.600(A), the County determined that underground petroleum storage tanks present a threat to water resources when located within a WRPA because of the risk of releases of petroleum. *Id.*   Such releases might negatively impact groundwater resources, a resource the County depends upon to meet the drinking water needs of the citizens of New Castle County. *Id.*

## ARGUMENT

I. **THE UDC'S ZONING PROVISIONS THAT PROHIBIT THE STORAGE OF HAZARDOUS SUBSTANCES AND PETROLEUM PRODUCTS IN ENVIRONMENTALLY SENSITIVE AREAS WHILE ALLOWING EXISTING OPERATIONS TO CONTINUE AS NONCONFORMING USES ARE RATIONALLY RELATED TO THE LEGITIMATE GOVERNMENTAL INTEREST OF PROTECTING WATER RESOURCES WHILE RECOGNIZING VESTED PROPERTY RIGHTS THAT ARE PROTECTED UNDER THE UNITED STATES CONSTITUTION AND THE DELAWARE CODE.**

A. **Burden of Proof**

1. **Burden of Proof on a Motion for Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The parties have stipulated to the relevant facts and compiled a Joint Appendix. Under the facts as stipulated by the parties, New Castle County is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

2. **Standard of Review in Equal Protection Cases**

The Equal Protection Clause of the Fourteenth Amendment requires that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV. "Land use ordinances that do not classify by race, alienage, or national origin, will survive an attack based on the Equal Protection Clause if the law is 'reasonable, not arbitrary' and bears 'a rational relationship to a permissible state objective'" *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 133 (3d Cir. 2002) (citing *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8 (U.S. 1974)). To prevail on

its equal protection claim, Wawa bears the burden of proving the County's zoning regulations "'so lack rationality that they constitute a constitutionally impermissible denial of equal protection.'" *Rogin v. Bensalem Township*, 616 F.2d 680, 688 (3d. Cir. 1980) (citing *New Orleans v. Dukes*, 427 U.S. 297, 305 (1976) (per curiam)).

"[C]ourts are reluctant to overturn governmental action on the ground that it denies equal protection of the laws." *Congregation Kol Ami*, 309 F.3d at 133 (citing *Vance v. Bradley*, 440 U.S. 93, 97 (1979)). "Indeed, land use law is one of the bastions of local control, largely free of federal intervention." *Id.* at 135 ("the federal courts have given states and local communities broad latitude to determine their zoning plans"). Likewise, the Supreme Court has stated that "the power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities.... The courts generally have emphasized the breadth of municipal power to control land use." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981); *see also FERC v. Mississippi*, 456 U.S. 742, 768 n.30 (1982) ("Regulation of land use is perhaps the quintessential state activity."); *Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3d Cir. 1988) ("Land use policy customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong."). Accordingly, "courts are reluctant to overturn governmental action on the ground that it denies equal protection of the laws." *Congregation Kol Ami*, 309 F.3d at 133.

Construing Wawa's claims in the light most favorable to it, and considering this very forgiving standard of review, it is clear that Wawa cannot meet its burden of proving

an Equal Protection violation.  Summary judgment should be granted in favor of the County.

**B.     The UDC's Prohibition Against the Storage of Hazardous Substances and Petroleum Products in Environmentally Sensitive Areas is Rationally Related to the Legitimate Governmental Interest of Protecting Water Resources.**

**1.     The County has a Legitimate Governmental Interest in Protecting Water Resources**

Article II, Section 25 of the Delaware Constitution permits the Delaware General Assembly to empower the County to enact zoning regulations.  Del. Const. art II, § 25. Pursuant to this authority, the General Assembly empowered the County to enact zoning regulations for the purpose of promoting the health, safety, morals, convenience, order, prosperity or welfare of the present and future inhabitants of the County.  9 *Del. C.* §§ 2601, 2603(a).  Included in the zoning authority granted to the County is the power to regulate land for water supply conservation and to facilitate and provide adequate provisions for public requirements such as water flowage and water supply.  9 *Del. C.* §§ 2601, 2603.  Pursuant to this authority, the County first adopted a zoning code on September 28, 1954.  Today, the County's subdivision and zoning code is contained in Chapter 40 of the New Castle County Code, commonly referred to as the Unified Development Code or "UDC."  Article 10 of the UDC contains zoning provisions relating to environmental standards.  UDC Division 40.33.300 (defines zoning regulations as Articles 1-15, 30-33).

Relevant to the matter presently before the Court are the provisions contained in UDC Division 40.10.600.  This division regulates the storage of hazardous substances and petroleum products in the County.  Clearly included within the scope of this division

are gasoline filling stations (hereinafter referred to as "gas stations."). Section A of this division prohibits the establishment of new gas stations in environmentally sensitive areas, specifically: floodplains, floodways, wellheads, the Cockeysville Formation, drainageways, recharge areas, steep slopes, critical natural areas, wetlands, riparian buffers and sinkholes. UDC Division 40.10.600 (A).

The division also regulates when operators of existing nonconforming gas stations may replace existing underground petroleum storage tanks. UDC Division 40.10.600 (B). The UST replacement language allows replacement subject to state and federal regulations in non-Water Resources Protection Areas. UDC Division 40.10.600 (B). Water Resources Protection Areas are defined as the Cockeysville Formation, Cockeysville Formation drainage areas, wellheads and recharge areas. UDC Division 40.33.300 (definition of WRPA). Thus, replacement of existing USTs are permitted, subject to state and federal regulations, in floodplains, floodways, steep slopes, critical natural areas, wetlands, riparian buffers and sinkhole areas. Replacement of underground UST's located in WRPA's may only occur where an upgrade is required by DNREC. UDC Division 40.10.600.B

As stated above, the purpose of regulating the storage of hazardous materials and petroleum in these areas is to protect the County's aquifers and water resources from pollution from these substances. (J.A. 2, ¶ 4). Groundwater resources are essential to meet the drinking water needs of the citizens of Delaware. (J.A. 6, ¶ 13). Since 1988, the County has identified in the adopted Comprehensive Zoning Plans its interest in reducing pollution and contamination of aquifers and water resources caused by gasoline and fuel oil leaking from USTs. (J.A. 2, ¶¶ 4, 5). The parties have stipulated to the fact that UDC

Division 40.10.600 serves the legitimate governmental interest of protecting water resources.  (J.A. 6, ¶ 13).

> ### 2.    UDC Division 40.10.600 is Rationally Related to the Legitimate Governmental Interest of Protecting Water Resources.

Wawa argues that the provisions in UDC Division 40.10.600 (B) concerning the replacement of existing underground storage tanks irrationally increase the risk to water resources by creating inappropriate incentives for the operators of nonconforming gas stations to leave old USTs in the ground.  (Opening Br. at 18-22).  Stated differently, Wawa argues that the replacement provisions for USTs are not rationally related the County's interest in protecting water resources.  Wawa raises myriad issues that amount to the legal equivalent of throwing every plausible factual scenario against the wall to see what sticks.  Ultimately, claiming that UDC Division 40.10.600 violates Wawa's constitutional requirement of equal protection is simply without merit.

Wawa is specifically concerned with the provisions relating to replacement of existing USTs in WRPAs.  (Opening Br. 19-21).  The regulations governing UST replacement in WRPAs are more restrictive than the regulations governing their replacement in non-WRPAs.  In a non-WRPA, a tank can be replaced upon the discretion of the operator where all state and federal regulations are met.  However, the replacement of USTs in WRPA's can only be performed where an upgrade is required by DNREC. UDC § 40.10.600.B.

Wawa states that "the County made this error by failing to evaluate the interelationship of DNREC regulations governing USTs and the County's own regulations on nonconforming use."  (Opening Br. at 18).  This statement is patently

14

false. The distinction between non-WRPAs and WRPAs was an deliberate legislative act aimed at reducing the number of nonconforming USTs in WRPAs at a faster rate than that of non-WRPAs. The provision allowing replacement of USTs in WRPAs where an upgrade is required by DNREC was added to the UDC in 1998 at the request of DNREC to accommodate DNREC's universal upgrade requirements. (J.A. 4, ¶ 10). DNREC, under the authority granted by the Delaware Underground Storage Tank Act, has adopted regulations applicable to USTs. 7 *Del. C.* § 7407(a). Pursuant to these regulations, universal tank upgrades have been required. For instance, in 1998 DNREC required all existing USTs to meet certain designated upgraded corrosion protection requirements. (J.A. 4, ¶ 10). If DNREC issues another upgrade requirement, nonconforming UST operators located in WRPAs can upgrade the USTs without losing nonconforming status. However, if DNREC does not require an upgrade, a UST in a WRPA cannot be replaced.

The result of this provision is that if DNREC determines that a UST upgrade is necessary to "protect human health and the environment" such an upgrade may be made. 7 *Del. C.* § 7407(a). Contrary to Wawa's contention that this provision is irrational, it actually serves to further the County's interest in protecting water resources by allowing the installation of better, safer USTs. In an analogous case, the Supreme Judicial Court of Maine reviewed an ordinance that prohibited construction of septic systems within 100 feet of a shoreline. *Drake v. Town of Sanford*, 643 A.2d 367 (Me 1994). The purpose of the regulation was to "prevent and control water pollution." *Id.* at 370. The ordinance was subject to an equal protection challenge because the ordinance allowed the improvement and replacement of nonconforming septic systems. The court denied the equal protection claim by finding that:

15

> Allowing the improvement of non-conforming sewage systems bears a rational relation to the same purpose. The State is concerned about water quality and prohibits new subsurface wasterwater disposal systems within 100 feet of the shoreline. It is nevertheless rational to allow an owner to replace a leaking system with one that is much less likely to leak. Modernization of facilities connected with a nonconforming use is normally permissible.

*Id.* at 370.

Wawa contends that a DNREC UST upgrade requirement should trigger loss of nonconforming status and thus the provision is irrational. The possibility of alternative regulatory schemes does not render the zoning scheme chosen "irrational." *See Delaware River Basin Comm'n v. Bucks County Water and Sewer Authority*, 641 F.2d 1087, 1102 (3d Cir. 1981) (explaining rational basis analysis does not require a legislative scheme to be the "best" or "fairest" but merely reasonable.). Additionally, expiring nonconforming uses based on a regulatory upgrade requirement could very possibly give rise to a takings claim. As one judge has opined, "compliance with state-mandated cleanup laws should not be used as a guise by local authorities to eradicate nonconforming uses by law-abiding property owners." *Bell v. Rocky River Board of Zoning Appeals*, 702 N.E.2d 910 (Oh 8th Dist. Ct. App 1997) (dissenting opinion).

Wawa next argues that by not allowing tanks to be replaced except by DNREC upgrade requirement, the County is creating an incentive for the "unethical owner/operator" to keep a UST in the ground too long. (Opening Br. at 22). Wawa acknowledges that as a capital asset, a UST has a useful life. (Opening Br. at 19). Typically, the manufacturer provides a warranty for the duration of the UST's useful life - usually thirty years. (J.A. 7, ¶ 17). It is likely that once the warranty expires, insurance for continuation of the operation increases. Additionally, if there is a leak and no

insurance coverage is available, it is likely that the owner/operator will be responsible for the assessment of any fines, penalties and the cost of remediation. The point is, the choice to discontinue the nonconforming use will be a business decision that properly rest with the operator. Ultimately, limiting when a tank can be replaced in a WRPA furthers the goal of phasing out nonconforming uses. See UDC Division 40.08.000 (B) (providing that "[w]hile this Article permits nonconformities, it restricts further investments which would tend to make a nonconforming situation more permanent").

Wawa offers that the County could regulate the replacement of USTs in a more exacting manner to better achieve the goal of protection of water resources. Wawa fails to recognize that allowing the existence of many other sources of pollution does not render the ordinance irrational, "because equal protection does not require the government to address any particular problem 'in one fell swoop.'" *Haves v. City of Miami*, 52 F.3d 918, 922 (11th Cir. 1995) (finding a rational-basis existed for allowing the continued operation of thirty-eight house boats while eliminating all others). Rather than just raising hypothetical weaknesses with an ordinance, "those attacking the rationality of the legislative classification have the burden to negate every conceivable basis which might support it." *F.C.C. v. Beach Communications,* 508 U.S. 307, 315 (U.S. 1993). Wawa has failed to meet this burden.

The County has shut the door to the establishment of new gas stations in environmentally sensitive areas. Approximately thirty-eight gas stations exist as nonconforming uses. (J.A. 6, ¶ 15). Just like all other nonconforming uses in the County, those gas stations will be phased out pursuant to the UDC's Article 8 nonconforming use provisions. However, gas stations located in WRPAs have the

additional restriction that there can be no UST replacements unless DNREC requires it. The end result will be that operators will vacate these sites when the useful lives of the tanks expire. Certainly Wawa cannot argue that limiting gas stations to the thirty-eight (38) nonconforming uses and phasing these out over time is a rationale "so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1 (U.S. 1992).

As discussed *infra*, it is clear that the continuation of nonconforming uses is both constitutionally permissible and statutorily mandated. Additionally, limiting when a UST can be replaced in a WRPA furthers the dual goals of phasing out nonconforming uses and protecting the County's water resources by permitting DNREC upgrades.

**C. Prohibiting New Users from Storing Hazardous Substances and Petroleum Products in Environmentally Sensitive Areas While Allowing Existing Users to Continue Operation in Such Areas Subject to the UDC's Nonconforming Use Provisions Comports with the Guarantee of Equal Protection under the Fourteenth Amendment to the United States Constitution.**

The zoning provisions contained in the UDC prohibit the placement of new USTs in WRPAs. UDC Division 40.10.600. However, any gasoline station that was legally established prior to the County's prohibition against such uses in WRPAs may continue to operate as a nonconforming use. (J.A. 6, ¶ 14). A nonconforming use is the lawful use of any land, as existing and lawful at the time of the enactment of a zoning regulation, or in the case of a change of regulations, then at the time of such change. *See 9 Del. C. §* 2610(a); UDC Division 40.33.300 (definition of nonconforming use). Nonconforming uses may continue subject to the provisions contained in Article 8 of the UDC.[1]

---

[1] UDC Article 8 provides that a nonconforming use that is discontinued for a period of six months (6) shall not be reestablished. UDC §40.08.120. The nonconforming use also

Nonconforming gasoline stations in WRPAs are also subject to the provisions of Article

10 of the UDC. *See* UDC § 40.08.130(D). Article 10 prohibits replacing USTs in

WRPAs unless an upgrade is required by Delaware Department of Transportation. UDC

§ 40.10.600.

Wawa argues that because legally nonconforming UST uses are permitted to

continue in WRPAs, the County's prohibition against the establishment of new UST uses

is not rationally related to the purpose of protecting the County's natural resources.

(Opening Br. at 15). Wawa further contends that the classification between existing users

and those desiring to establish a new use is irrational and violates the Equal Protection

Clause of the United States Constitution. (Opening Br. at 15). Wawa cites six cases to

support these arguments. (Opening Br. at 15-17).

Wawa's reliance on these cases has surface appeal but ultimately the cases serve

only to obfuscate the issue before the Court. While these cases implicate grandfathering

provisions that courts found objectionable, the grandfathering provisions were not related

to zoning ordinances. Rather, each of these cases involved a safety regulation. *See, e.g.,*

*City of Juneau v. Badger Co-operative Oil Co.*, 279 N.W. 666, 672 (Wis. 1938) (stating

"[t]he ostensible and only lawful purpose of the provisions of the ordinance is to furnish

protection from fire and explosives"); *In re Martin*, 504 P.2d 14 (Nev. 1972) (finding the

ordinance was "enacted to decrease the danger of fire and thus promote public safety").

Indeed, each of the six courts found that existing uses posed the same fire safety concerns

as the prohibited future uses and accordingly, there existed no basis to allow the

continuation of existing uses. Several of the courts did however recognize that safety

---

terminates if over fifty (50) percent of the assessed value is destroyed. UDC
§40.08.130(A).

ordinances are different than zoning ordinances and that protecting nonconforming uses is entirely appropriate in zoning ordinances.

In *Boothby v. City of Westbrook*, the court reviewed an ordinance that prohibited the sale of explosives, such as gasoline, gunpowder and oil, within 300 feet of churches, schools and hospitals. *Boothby v. City of Westbrook*, 23 A.2d 316 (Me. 1941). The court found that the purpose of the ordinance was fire prevention and that allowing owners of existing gasoline stations to continue to operate did not promote fire safety, thus the distinction between new and existing owners was arbitrary. *Id.* at 319. However, the court distinguished the treatment of existing uses through safety ordinances from the treatment of nonconforming structures and uses in zoning laws by stating:

> [Zoning] legislation, although enacted in the exercise of the police power, is markedly different in principal and purpose from regulations of the type under consideration, and is governed by entirely different rules of law. It is the trend of judicial opinion that this distinction is real and must be recognized. That this distinction should be observed in this jurisdiction is patent. The exemption of existing nonconforming structures and uses from the provisions of zoning ordinances and by-laws is expressly sanctioned by the zoning statute. There is no such authority for such exemption in the fire prevention statute.

*Id.* at 320 (internal citations ommitted). Citing *Boothby*, the court in *Consumers Gasoline Stations v. City of Pulaski*, 292 S.W.2d 735, 737 (Tenn. 1956), found that a city ordinance limiting the installation of underground gasoline storage tanks was unconstitutional since it discriminated against a person from establishing a new filling station on his property while allowing a pre-existing filling station to continue operation. The court was careful to stress:

> However, the ordinance in question is not a zoning ordinance but is evidently intended to prevent explosions and risk of fire. It might be said that zoning ordinances are *sui generis* and fall into a classification unto themselves.

*Id.* at 737.

Likewise, in the two other cases cited by Wawa, the courts clearly provide that the offending grandfathering provisions were contained in a safety regulation but would have been subject to a different analysis if the provisions were part of a zoning ordinance. In *Standard Oil Co. v. City of Charlottesville*, 42 F.2d 88, 90 (4th Cir. 1930), the Fourth Circuit noted from the outset that the ordinance in question did not "purport to be a zoning ordinance" thus the principals of zoning law could not be applied. The Court explained:

> So far as the public safety is concerned, it can make no possible difference that the business was being carried on at the time of passage of the ordinance. The line of cases exempting businesses from terms of zoning ordinances or existing buildings from the terms of fire limit ordinances have no application; for in the case of such ordinances the classification adopted has a reasonable relation to the end in view, whereas, in the case of an ordinance that forbids the carrying on of a business as dangerous to the community, the exemption of existing businesses has no such reasonable relation.

*Id.* at 93. This same language was more recently repeated by the court in *Standard Oil Co. v. City of Gadsden*, 263 F. Supp 502, 507 (N.D. Ala 1967). Rather than prove the County's nonconforming use provisions violate the Equal Protection Clause, the cases cited by Wawa support the County's position that recognition of nonconforming uses in zoning provisions is constitutional.

Wawa completely disregards the long history of acceptance and validity that nonconforming use provisions in zoning codes have enjoyed. *See generally* 1 Anderson's Am. Law. Zoning § 6:5 (4th ed.) (discussing the history of judicial acceptance of nonconforming use provisions in zoning codes); 1 Rathkopf's The Law of Zoning and Planning § 4:7 (comparing the treatment of nonconforming use provisions in zoning

codes with the treatment of grandfathering provisions in nonzoning codes). Relying on

Euclidian zoning principals, in 1929 the Supreme Court affirmed a decision in which the

Supreme Court of Louisiana recognized the validity of nonconforming use provisions in a

city's zoning code and rejected similar Equal Protection challenges that Wawa now

brings. *Sampere v. City of New Orleans*, 117 So. 827 (1928), *aff'd* 279 U.S. 812 (1929);

Accord *Zahn v. Board of Public Works*, 234 P. 388 (1925), *aff''d* 274 U.S. 325. In

*Sampere*, the court addressed the equal protection argument by stating:

> In our opinion, this attack upon the constitutionality of the ordinance is not
> well-founded. The exception in favor of existing buildings and the
> existing use of them is not unjustly discriminatory. To except these
> buildings and the continued use of them from the ban of the ordinance is
> reasonable. The council had a right, in adopting the ordinance, to place
> such buildings and their use in a class by themselves and except them,
> including the use to which they were being put, from the prohibition of the
> ordinance. The council has the right to do this in order to avoid making
> the ordinance unnecessarily harsh and burdensome. The council, in so
> doing was denying to no one the equal protection of the laws, for the
> ordinance, based upon a classification, which is not arbitrary, but which
> appears to be sound and just, applies to all similarly situated.

*Sampere*, 117 So. at 828.

Likewise, under Delaware law, the purpose of non-conforming use provisions in

zoning ordinances is to ensure that such ordinances are not confiscatory of property rights

that vested prior to the adoption of such ordinances. *See Shellburne, Inc. v. Roberts*, 224

A.2d 250, 281-82 (Del. 1966) (stating that Delaware law recognizes that zoning law

changes cannot retroactively apply to nonconforming uses); *In re 244.5 Acres of Land v.*

*Delaware Agric. Lands Found.*, 808 A.2d 753 (Del. 2002) (clarifying the holding in

*Shellburne* and redefining when property rights vest).

Delaware Courts have recognized that "the purpose of a zoning ordinance is as

much to protect an owner's right to a lawful nonconforming use as it is to protect the

22

rights of other property owners against unlawful uses . . . ." *Hooper v. Delaware Alcoholic Beverage Control Comm'n*, 409 A.2d 1046, 1050-51 (Del. 1979) (approving and adopting as Delaware law the rulings stated in *New Castle County v. Harvey*, 315 A.2d 616 (Del. Ch. 1974)). The Delaware Supreme Court has also recognized that the theory to "nonconforming uses is that eventually the proscribed use will be terminated or abandoned with the passage of time, and that the property will then be made to comply with the appropriate zoning classification." *Mayor and Council of New Castle v. Rollins Outdoor Advertising, Inc.*, 475 A.2d 355, 356 (Del. 1984) (en banc) (holding that amortization of nonconforming outdoor signs did not rise to the level of a constitutional taking).

Also ignored by Wawa is Delaware statutory law that mandates that the lawful use of any land may continue where such use may be declared illegal by adoption or change of zoning regulations. *See 9 Del. C.* § 2610. The County's nonconforming use provisions were not created by an arbitrary act of County Council. Rather, in 1951, when the Delaware General Assembly first provided the County with the power to adopt zoning regulations, it mandated that the County recognize and allow nonconforming uses. See 48 Del. Laws ch. 321, § 14 (currently codified at 9 *Del. C.* § 2610). The nonconforming use provisions presently codified in the Delaware Code appear in substantially the same form as they were originally adopted in 1951. When the County adopted its first zoning code on September 28, 1954 pursuant to the State's zoning enabling statute, the ordinance contained nonconforming use provisions and those provisions have been carried forward in every zoning code revision to the present.

Wawa's request that this Court disregard applicable statutory law as well as controlling case law should be flatly denied. The County's recognition of nonconforming uses is mandated by the General Assembly. See 9 *Del. C.* § 2601. Furthermore, Wawa cannot ignore nearly one hundred years of judicial interpretations and rulings that support the continuation of nonconforming uses in zoning schemes. Finally, the cases on which Wawa bases its Equal Protection attack are irrelevant to the matter before this Court since they are not zoning cases. Wawa's claim that prohibiting new uses while allowing existing UST uses to continue subject to the UDC's nonconforming use provisions violates the Equal Protection Clause can only be viewed spurious.

## II.    THE UDC'S TEMPORARY ALLOWANCE OF NONCONFORMING UNDERGROUND STORAGE TANKS RATIONALLY FURTHERS THE PURPOSE OF PROTECTING WATER RESOURCES WHILE RECOGNIZING VESTED PROPERTY RIGHTS.

Wawa's second argument is that the UDC permanently preserves USTs that were legally built in WRPAs before such a use was prohibited, and that this permanency violates the Equal Protection Clause. While Wawa claims that UDC Division 40.10.600 contains a grandfather clause that is "effectively permanent," it reaches this conclusion only through assuming that the provisions of the UDC which prevent the permanent preservation of nonconforming uses will not have their intended effect.

Recognizing that the U.S. Supreme Court has upheld grandfather clauses against Equal Protection challenges, Wawa looks to the Third Circuit case of *Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 641 F.2d 1087 (3d Cir. 1981) and its subsequent remand to the Eastern District of Pennsylvania in *Delaware River Basin Comm'n v. Bucks County Water & Sewer Auth.*, 545 F. Supp. 138 (E.D. Pa. 1982) for the

24

proposition that the Third Circuit handles permanent grandfathering differently than temporary grandfathering. In the latter case, the District Court noted "the Supreme Court has not said that permanent grandfathering is per se bad," and concluded that "[t]he upshot would seem to be that permanent grandfathering calls for somewhat more exacting insistence on the rationality of the classification than temporary grandfathering." *Id.* at 147 (citations omitted).

The regulation at issue in the *Delaware River Basin* litigation was a rate scheme for the use of the surface waters of the Delaware River. *Id* at 139. The regulation contained an exemption for water users who had a "legal entitlement" to draw water from the Delaware before 1961, when the Delaware River Basin Compact (the "Compact") became effective. *Id.* Considering this exemption, the Third Circuit stated "one striking characteristic of the exemption as granted is it permanency." *Delaware River Basin Comm'n*, 641 F.2d at 1089.

The Third Circuit recognized that "a legislature may undertake reforms a step at a time, and that a reviewing court ordinarily should not overrule a legislative decision simply because the challenged provision adopts a gradual approach to solving a problem." *Id.* However, the Third Circuit was unable to conceive how an apparently permanent exemption granted to pre-1961 water users to the extent of their legal entitlement served a legitimate government interest. *Id.* at 1099, 1100. One factor in the court's reasoning was the lack of any apparent reliance interest on the part of pre-1961 users in their legal entitlement to a certain amount of water where actual usage was historically less. *Id.* at 1097, 1099. Rather than conclusively rule on the constitutional question, the Third Circuit remanded the case to the District Court so that the Delaware

25

River Basin Commission and any intervenors could advance an appropriate rationale for the regulation. *Id.* at 1100.

The District Court, having heard the parties further address the issues, found that the preservation of existing development and the protection of significant reliance interests were legitimate ends to the regulation, and that the regulation differentiated among water users in a way that rationally related to these ends. *Delaware River Basin Comm'n*, 545 F. Supp. 138, 148. Addressing the Third Circuit's concern about the broad scope of the rate scheme, the District Court stated that the government likely meant to protect not only existing but anticipated water usage of the pre-1961 users, as these users would have reliance interests in their full legal entitlement, citing as an example users who would have incorporated future plans for expansion into their projections. *Id.* at 144-146.

As to the issue of permanent grandfathering, the District Court determined that the exemption was "not wholly permanent." *Id.* at 147. If an initial user were to "go out of existence," a new user would not be entitled to the exemption upon replacing the initial user. *Id.* While the exemption would be permanent for users such as municipalities, this exemption was nevertheless rational. *Id.* The discrimination between users did not treat identical groups differently, but established a rate scheme that respected distinctions among the groups, such as the need for the cooperation of existing users in the early days of the Compact, and the different degree to which pre and post 1961 users would rely on the free use of water. *Id.* at 147, 148.

Although the Third Circuit appears to set a higher bar within the rational basis standard for permanent grandfathering, the District Court's opinion shows how

26

grandfathering can be considered temporary, even when the date of expiration is uncertain; and how the protection of established reliance interests can be part of a rational basis that justifies even a permanent exemption.

As a zoning regulation, the challenged ordinance in this case has little in common with the type of regulation that the Third Circuit was concerned with in the *Delaware River Basin* litigation. Rather than a rate scheme that provides a permanent immunity from charges to a particular constituency, the ordinance here is part of a system of limitations on land use that will lead to the eventual elimination of nonconforming uses. A plain reading of the UDC shows that it does not grant permanent immunity for petroleum USTs in WRPAs.

The operation of a UST within a WRPA, like all nonconforming uses, is subject to the nonconforming use limitations of UDC Article 8. The purpose of the UDC's regulations on nonconforming situations are set out in UDC Division 40.08.000. "While this Article permits nonconformities, it restricts further investments which would tend to make a nonconforming situation more permanent." UDC Division 40.08.000 (B). The spirit of a zoning ordinance is to restrict rather than increase nonconforming uses, securing the gradual elimination of such uses. *See Harvey*, 315 A.2d at 618. To the extent that provisions of the zoning code allow for the continuation of such uses, these sections should be strictly construed, and the provisions for limiting nonconforming uses should be liberally construed. *Id.* (citing 101 C.J.S. Zoning §182, p. 939; 1 Anderson's Am. Law of Zoning § 6:30).

The first nonconforming use limitation is found in UDC §40.8.120, which states that "[w]henever a nonconforming use is discontinued for a period of six (6) months,

*irrespective of the reasons therefore*, such use shall not thereafter be reestablished and any future use shall be in accordance with this Chapter." (Emphasis added). Wawa asserts that an owner of a nonconforming use will simply act to avoid the application of this section. (Opening Br. at 25). This view assumes that each nonconforming owner will be aware of both the parcel's nonconforming status, as well as the six-month deadline to resume a discontinued use. Wawa also apparently assumes that no situation will arise that is beyond the operator's control.

The County need not establish an intent to abandon the use on the part of the owner. Construing a similar ordinance, the Tenth Circuit upheld a trial court finding that a nonconforming use (a lodge that was a legal use when construction began) had been discontinued where construction on the lodge had ceased and the developer had no contact with local building department for the requisite length of time. *C.F. Lytle Co. v. Clark*, 491 F.2d 834, 837 (10th Cir.1974); *See also Franmor Realty Corp. v Le Boeuf* (1951) 104 NYS2d 247, *affd* 109 NYS2d 525, *rearg and app den* 110 NYS2d 910 (holding that it was not necessary to show intentional abandonment of a gas station where ordinance specifically terminates nonconforming uses upon being discontinued for twelve months).

This limitation alone refutes Wawa's assertion that existing underground tanks in WRPAs are permanently grandfathered. Mere nonuse for a six month period can lead to the termination of the use. This limitation is evidence of the County's gradual approach to solving the problem of nonconforming USTs in WRPAs. While the owners of nonconforming gas stations may attempt to avoid the application of this rule, the same could be said of the owner of any nonconforming use in this County, or any other

28

municipality with a limitation based on discontinuance or abandonment. Nevertheless, provisions such as this have resulted in the ultimate elimination of a nonconforming use. *See Service Oil Co. v. Rhodus*, 500 P.2d 807 (Colo. 1972) (holding that nonconforming service station had been abandoned where fire severed the improvements from the real estate and the station owner, while waiting to settle its claim for insurance, made no effort to obtain a permit for restoration in the requisite 180 days). To the extent that *Service Oil* required any showing of intent to abandon the use, the Supreme Court of Colorado overruled itself in *Hartley v. City of Colorado Springs*, 764 P.2d 1216 (1988) (declaring that requiring proof of intent to abandon would expand the scope of the ordinance and would break from the rule that ordinances regulating nonconforming uses must be narrowly construed).

The UDC's limitation of nonconforming uses does not end with terminating discontinued uses. The next constraint is found in the first sentence of UDC §40.08.130, which states that a "[n]onconforming use of a building or structure or lot shall not be extended or enlarged."[2] Wawa omits this provision in its analysis of the hurdles that stand in the way of a grandfathered operator of a UST within a WRPA from operating forever. Although the provision does not explicitly provide for the termination of a nonconforming use, similar provisions have been used as a method to passively phase out nonconforming uses by municipalities that have not been given the authority to terminate existing uses. 1 Anderson's Am. Law of Zoning § 6:35 (4th ed.). The UDC employs this tool in addition to the provisions that more directly result in termination of the use.

_____

[2] §40.08.130(D), which allows the expansion or extension of a nonconforming *situation* located in a WRPA, subject to compliance with the standards established in Article 10 (Environmental Standards), limits the expansion of a nonconforming situation that might otherwise be permitted under §40.08.130(B). §40.08.130(D) has no impact on UDC §40.08.130 (A).

The third limitation that the operator of a nonconforming gas station would face is found in the second sentence of UDC §40.08.130, which states "[a] nonconforming use terminates when the building, structure, or other improvement is destroyed in excess of fifty (50) percent of the assessed value of such building, structure or other improvement." Not only does this provision terminate a use that is damaged through no fault of the owner, it prevents the intentional demolition of a site for the purpose of renovating - and therefore extending the life - of a nonconforming use on that site.

A similar provision was considered by the South Carolina Supreme Court in *Christy v. Harleston*, 223 S.E.2d 861 (1976), where a property owner had used an aging garage for the storing of equipment incident to his heating and air-conditioning business. A zoning code was adopted, designating the owner's property as residential, and rendering the storage of equipment a nonconforming use. *Id.* at 862. When the owner replaced his garage and began using the new garage in the same manner as the old structure he was prosecuted for a zoning violation. *Id.* A trial court enjoined the violation, but the Supreme Court reversed, holding that the replacement of the structure with a new garage would be a violation of the zoning ordinance. *Id.* at 863. Under the zoning code at issue, a use could only be extended throughout the structure if no structural alterations were made, other than those necessary to assure the safety of the structure. *Id.* at 862-863. In addition, no building damaged to the extent of 50 percent or more could be replaced. *Id.* at 863. The Supreme Court determined that allowing the property owner to demolish a building and replace it to continue a nonconforming use would be inconsistent with both of these restrictions and inconsistent with the zoning code generally. *Id.*

30

Just as the ordinance in *Christy* made allowances for structural alterations related to safety, UDC Division 40.10.600 protects human health and the environment by allowing UST's to be upgraded when required by DNREC. This common-sense provision, which reconciles the nonconforming use provisions of the County's zoning code with safety requirements in the State's regulation of USTs, is styled as a permanent grandfather clause by the Plaintiff. However, the provision that actually grants the right of continued use to a nonconforming UST is found in UDC §40.08.020: "[e]xcept as otherwise specifically provided in [Article 8], any nonconforming situation may continue to remain as the same nonconforming situation."

In the special circumstance where DNREC requires an upgrade to a UST, UDC Division 40.10.600 (B) allows the upgrade. USTs within WRPAs are otherwise subject to the restrictions in Article 8 that are intended to phase out nonconforming uses. The impact of UDC Division 40.10.600 (B) is limited to the tank itself, and does not apply to any other improvement associated with the storage, maintenance, use, or sale of petroleum products. This division would not allow the replacement of a tank in any other circumstance, and does not otherwise halt the application of UDC §40.08.120 to a discontinued use, or the application of UDC §40.08.130 (A) to restrict extension or expansion. By interpreting the UDC as permanently exempting existing USTs within WRPAs, Wawa effectively ignores statutory provisions to the contrary.

## **CONCLUSION**

For the forgoing reasons, New Castle County requests this Honorable Court to

deny Wawa's Motion for Summary Judgment, granting Summary Judgment for New

Castle County instead, since there are no issues of material fact and New Castle County is

entitled to judgment as a matter of law.

NEW CASTLE COUNTY LAW

/s/ Brian J. Merritt
Brian J. Merritt (#3982)
Assistant County Attorney
Mary A. Jacobson (#3508)
First Assistant County Attorney
87 Reads Way
New Castle, DE 19720
(302) 395-5130

Dated: March 16, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| WAWA, INC., a corporation of the State of New Jersey, | ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | C.A. No. 04-322-KAJ |
| THE GOVERNMENT OF NEW CASTLE COUNTY, DELAWARE, a political subdivision of the State of Delaware, | ) ) ) ) ) |  |
| Defendant. | ) ) ) |  |

## CERTIFICATE OF SERVICE

I, Brian J. Merritt, hereby certify that on this 16th day of March, 2005, two copies

of Defendant Government of New Castle County's Answering Brief in opposition to

plaintiff's Motion for Summary Judgment was mailed via U.S. mail, postage prepaid to

counsel at the following address:


Matthew F. Lintner, Esquire (#4371)
222 Delaware Avenue – 10th Fl.
P.O. Box 2306
Wilmington, DE 19899


                                        NEW CASTLE COUNTY LAW

                                        /s/ Brian J. Merritt
                                        Brian J. Merritt (#3928)
                                        Assistant County Attorney
                                        New Castle County Law Department
                                        87 Reads Way
                                        New Castle, DE 19720
                                        (302) 395-5130

Dated: March 16, 2005